UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ADAM FINK,

          Petitioner,                              Hon. Janet T. Neff

v.                                            Case No. 1:13-CV-689

WILLIE SMITH,

          Respondent.

_____/

**REPORT AND RECOMMENDATION**

This matter is before the Court on Fink's petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Fink's petition be **denied**.

**BACKGROUND**

As a result of events allegedly occurring between January 2008 and July 2008, Petitioner was charged with two counts of first degree criminal sexual conduct, two counts of second degree criminal sexual conduct, and one count of attempted first degree criminal sexual conduct. (Trial Transcript, August 24, 2010, 49-50). Several individuals testified at Petitioner's jury trial. The relevant portions of their testimony are summarized below.

**Amy Norman**

Amy Norman is married to Gerald Norman.  (Trial Transcript, August 25, 2010, 286).  At the time of trial, the couple had seven children ranging in age from one month to 16 years old.  (Tr. 286-87).  S.N., born on July 8, 1999, was the third-oldest of the couple's children.  (Tr. 286-87).  As of 2007, however, the couple had only five children.  (Tr. 288).  At that time, the Norman family lived in Irons, Michigan.  (Tr. 289).  The family lived in a mobile home while they were building a house.  (Tr. 289).

The Normans operated a scrap yard in Irons and another scrap yard in Otsego.  (Tr. 294).  In April 2007, Gerald Norman asked Petitioner to paint one of his vehicles.  (Tr. 290).  Petitioner "did a very good job" after which Gerald Norman asked Petitioner if he wanted to work in the Norman's scrap yard.  (Tr. 290-91).  In June or July 2007, Petitioner, who "didn't have a place to live," moved in with the Normans.  (Tr. 291).  The Normans did not ask Petitioner to move in and Petitioner "never asked if he could stay."  (Tr. 291).  Instead, Petitioner "just started sleeping" on their couch.  (Tr. 291-92).

In December 2007, Gerald Norman underwent open heart surgery.  (Tr. 295).  Shortly thereafter, the Normans closed the scrap yard in Irons and decided to move to Kalamazoo so that they could operate the Otsego scrap yard.  (Tr. 294-97).  Petitioner "was very upset" that the Normans were moving and "really wanted to move with" them.  (Tr. 300-01).  The Normans agreed to let Petitioner move with them in light of Gerald Norman's physical limitations following open heart surgery.  (Tr. 317).  Petitioner agreed, however, to move elsewhere once he received his income tax refund.  (Tr. 318).

The Normans purchased a home in the Kalamazoo area on January 22, 2008.  (Tr.

297).  The two nights prior to purchasing the house, January 20-21, 2008, the Normans and Petitioner stayed at a Red Roof Inn in the Kalamazoo area.  (Tr. 297-99).  The group stayed in two unconnected rooms.  (Tr. 299-302).  Amy Norman could not recall specifically which children stayed in which room, but she was sure that Petitioner did not sleep in the room with her and Gerald. (Tr. 300).

The Normans "cared about" Petitioner "very much" and treated him like a member of their family.  (Tr. 305-12).  Amy Norman "loved" Petitioner like a member of her family.  (Tr. 312).  At this point in time, Amy Norman "didn't have any direct suspicions" regarding Petitioner. (Tr. 315).  She had, however, previously observed Petitioner with Stevie Howes, a 15 year old boy. (Tr. 315-16).  When asked what she observed, Norman responded:

> [Petitioner] came in a truck that he brought scrap in and [Petitioner] was sitting in the driver's spot and Steven - Stevie was right next to him in the seat, in the middle seat of the truck and he had his head laying on [Petitioner] and he was asleep.  And there was nobody in the passenger seat of the truck.

(Tr. 316).  Amy Norman thought it was "weird that a teenage boy would have his head laying on an older man."  (Tr. 316).

In February 2008, Petitioner received an income tax refund of more than three thousand dollars, but refused to move out as he had agreed to do.  (Tr. 318).  Amy Norman "threw a fit" and ordered Petitioner to move out.  (Tr. 318-19).  Petitioner then moved in with Tom Norman, Gerald Norman's brother.  (Tr. 319).  Petitioner complained that Tom Norman's house was "nasty." (Tr. 319).  Petitioner stayed with Tom Norman for "maybe two or three weeks" before Amy Norman "agreed to let [Petitioner] move back in because [she] felt sorry for him."  (Tr. 319).

Amy Norman then began to witness changes in her son S.N.  (Tr. 322).  When asked

3

what she observed, Norman stated:

> Many things.  [S.N.] had outbursts all the time.  He would just get really mad and say, I hate Adam.  I hate Adam.  And at other times, he would ask if he could go places with Adam.  And I said, well that is weird - to myself.

(Tr. 322-23).

Amy Norman then described incidents in which S.N. and Petitioner would sit together under a blanket:

> Q:      Okay, you said lots of things.  Anything else you can think of?
>
> A:      I saw [Petitioner] under the covers with [S.N.] under blankets, sitting on the couch when we would watch movies.  And we would - my husband and I both that there is no reason for you to be under a blanket sitting - we didn't suspect anything, but we weren't - we thought we weren't going to let anything happen.
>
> Q:      So they are under a blanket on a floor?
>
> A:      On a couch?
>
> Q:      Sitting together?
>
> A:      Yes.
>
> Q:      What could you see outside of the blanket?
>
> A:      Well, several times when I turned around during the movie because his - the couch they were sitting on is behind us.  The TV is this way, the other couch is behind where Jerry and I are sitting.  I turn around and I see movement.  I see move real quick (sic).  I see [Petitioner] move real quick.  We said, we told you guys there is no sitting on a couch with blankets.
>
> Q:      If you just turned around and looked at them, what parts of their body could you see that were not under the blankets?

4

> A:     Their heads.
>
> Q:     Just the heads?
>
> A:     Yes.
>
> Q:     And you could see quick movement if you turned around?
>
> A:     Yes.  Uh - yes.

(Tr. 323-24).

Norman indicated that "several times" each week she would discover Petitioner sleeping in the same room with S.N. and his older brother Z.N.  (Tr. 324-27).  Norman also described overhearing a telephone conversation between Petitioner and Z.N. in which Petitioner stated to Z.N., "I love you."  (Tr. 327-28).

In July 2008, Amy Norman overheard a conversation in which S.N. told his father that Petitioner "had touched him on his penis" and that Petitioner had placed his hand "on [Petitioner's] penis on top of [his] pants."  (Tr. 327-31).  The Normans did not immediately report these allegations to the police, however.  With respect to this matter, the following exchange occurred:

> Q:     Why didn't you report it when you knew that there was touching?
>
> A:     Because Jerry said that he would have to go through too much.
>
> Q:     Who would?
>
> A:     [S.N.]
>
> Q:     What - what - did you guys talk about what too much was?

5

> A:    Yeah, we didn't want - we didn't want more of a deal
> made of it, than at the time when it was just touching,
> - he thought, he'll be okay; this is bad, he'll be okay.
> We are not going to have him go through all of these
> people asking him questions and putting ideas in his
> head.

(Tr. 342-343).

S.N. later told his mother that "more happened than just touching."  (Tr. 340-41).

S.N. told his mother than Petitioner "made him put his mouth on his penis and he made him suck

his penis." (Tr. 341).  S.N. said this "happened at the hotel." (Tr. 341).  At this point, the Normans

reported S.N.'s allegations to the police.  (Tr. 343).


**Gerald Norman**

Norman first met Petitioner when Petitioner was delivering metal to Norman's scrap

yard.  (Trial Transcript, August 25, 2010, 426).  Petitioner struck Norman as a hard worker, but

Norman also "had a couple of weird feelings" about Petitioner.  (Tr. 427).  Regarding this topic, the

following exchange occurred:

> Q:    Where - without telling me anything specific that
> anybody else said - if you could tell me what you had
> observed, what kind of suspicions did you have that
> you questioned him about?
>
> A:    Um, [Petitioner] had a young boy that he traveled
> around with often, his name was Stevie.  He would
> come in and Stevie would be like - when they came
> onto the scale, the truck, Stevie would be laying on
> his lap or cuddled up next to him laying on him and
> I thought that was weird.  So I asked him about it, you
> know.
>
> Q:    What did he say?

> A:    He told me that it was his cousin and that he was really sick and he was taking care of him and that he was the only one that cared about him and there was no one else to take care of the boy; so [Petitioner] did it.
>
> Q:    Did he tell you Stevie lived with him?
>
> A:    Yeah, he said that he would - he lived with him sometimes and other times that he wouldn't but he would go pick him up and do things for him I guess.

(Tr. 427-28).

After Petitioner moved in with the Normans, Stevie "was trying to be with" Petitioner and "calling him constantly," but he eventually "just kind of faded away." (Tr. 428). Norman allowed Petitioner to move in with his family in July 2007 because he "wanted to be able to help" him. (Tr. 429-30). Norman treated Petitioner like he was part of his family. (Tr. 430-32). Norman taught Petitioner work skills and included him on family vacations and outings. (Tr. 430-32).

The Normans eventually moved to be closer to their Otsego scrap yard. (Tr. 437). The Normans agreed to allow Petitioner to accompany them and live with them for a brief period of time until he could obtain his own residence. (Tr. 440). Petitioner never made any attempt, however, to obtain his own residence. (Tr. 440). Their first two nights in the Otsego area, the group rented two rooms in a Red Roof Inn. (Tr. 438). Norman was unable to recall precisely where everybody slept those two nights, but he was sure that S.N. and Petitioner slept in the same room both nights. (Tr. 438).

Norman described an incident in which he observed Petitioner and S.N. "sitting on the couch together holding hands. . .caressing, not so much holding, but like touching back and forth." (Tr. 450-51). Norman later asked S.N. if "Adam had made him feel uncomfortable or

7

touched him any - in any way that made him feel uncomfortable." (Tr. 451-52). S.N. responded, "no dad, I'm not a faggot." (Tr. 452). Norman often observed Petitioner and S.N. sleeping together. (Tr. 462-63). As S.N. "got to know [Petitioner] better," S.N. "started acting out" and "throwing temper tantrums." (Tr. 454-55). However, whenever S.N. thought Petitioner was going to move out, he "was happier." (Tr. 455).

Norman became more suspicious of the relationship between Petitioner and S.N. and eventually ordered that the two "weren't to be alone together." (Tr. 466-69). Petitioner and S.N. disregarded this instruction, however. (Tr. 470). Norman later overheard a telephone conversation between Petitioner and Z.N. in which the pair stated "I love you" to each other "many, many times." (Tr. 470). Following this incident, Norman again asked S.N. if Petitioner had "touched" him or "hurt" him. (Tr. 471). S.N. responded that Petitioner "touched him. . .touched him on his, like his clothes or something." (Tr. 471). Norman immediately went to the shop where Petitioner was working and began beating him. (Tr. 472-75). Norman did not immediately report the matter to the police. (Tr. 475). With respect to this particular issue, the following exchange occurred between Norman and the prosecuting attorney:

> Q:   Did you call the police after [S.N.] told you about the touching?
>
> A:   No.
>
> Q:   Why not?
>
> A:   I thought that was it, you know. I thought it was just a touch. We were moving. There was a lot - a lot going on and I thought, you know, my kid was going to be safe and it was just a touch and (inaudible, moved away from microphone) and talk to him and tell him how it wasn't right and tell him - he'd be okay. You know, I thought that I would be able to

take care of it.  I don't know why I thought that as bad as I was before, I don't know why I thought that I could, even with a touch, make him be okay.

Q:     Jerry -

A:     I had never seen it.

Q:     You said a lot was going on.  What was so important? Your child just got touched?

A:     Well, we were moving.  We - I'm sick.  I'm not - still not knowing that I am going to live, that I am going to get the house done for my family.  I am still working on the house and moving all the way back up north.  It was a lot for us.  We had schools.  I had all the children to change schools and get enrolled.  We had a lot of stuff.  That is what I mean by a lot and I didn't want - I don't know.  I've seen TV and heard of other court cases and didn't want to be here two years later, you know, for a touch.

Q:     So you thought that having [Petitioner] leave would resolve the issue?

A:     That's correct.

Q:     And you thought that your beating would cause him to leave?

A:     Yes.

(Tr. 475-76).

Approximately two weeks later, S.N. told his mother "that more happened."  (Tr. 476).  Amy Norman reported this to her husband who then contacted the police.  (Tr. 476).

9

**S.N.**

S.N. was presently eleven years of age.  (Trial Transcript, August 26, 2010, 560).  Petitioner moved in with the Norman family when the family still lived in Irons.  (Tr. 566).  Thereafter, Petitioner began to sexually assault S.N.  (Tr. 566-67).  Initially, Petitioner touched S.N.'s penis and forced S.N. to touch his penis.  (Tr. 567-70).  This activity occurred "lots of times."  (Tr. 570).  As part of a subsequent move, the Norman family and Petitioner stayed in a Red Roof Inn for two nights.  (Tr. 571).  The first night, Petitioner performed oral sex on S.N.  (Tr. 571-75).  The second night Petitioner again performed oral sex on S.N.  (Tr. 575-80).  Petitioner also forced S.N. to perform oral sex on him.  (Tr. 575-80).  After the family moved into their new house, this behavior continued.  (Tr. 585-92).  Petitioner often told S.N. that he loved him.  (Tr. 588).  Petitioner also purchased "treats and games" for S.N.  (Tr. 592).

**Richard Mattison**

As of August 25, 2008, Mattison was employed as a detective with the Kalamazoo County Sheriff's Department.  (Trial Transcript, August 26, 2010, 622-23).  On this date, Mattison was assigned to investigate the allegations against Petitioner.  (Tr. 623).  Detective Mattison attempted without success to communicate with Petitioner to "get his side of the story."  (Tr. 623-24).  Mattison "left several voice mail messages on [Petitioner's] cell phone and never did get a return call."  (Tr. 624).  Petitioner was eventually located in Washington state.  (Tr. 627).

As part of his investigation, Mattison contacted the Norman family which had by this time moved back to Irons, Michigan.  (Tr. 624).  Mattison arranged for S.N. to undergo a medical examination.  (Tr. 625).  Mattison also arranged for S.N. to participate in a second forensic interview

because "the [initial] forensic interview that was done, did not meet the County of Kalamazoo protocol for sexual assault examinations on children."  (Tr. 625, 630-36).

**Colette Gushurst**

Gushurst is a medical doctor who examined S.N. on January 9, 2009.  (Trial Transcript, August 26, 2010, 648-52).  S.N. "appeared comfortable" and "responded appropriately to questions."  (Tr. 653).  Dr. Gushurst examined S.N. outside the presence of his parents.  (Tr. 654).  S.N. stated to Dr. Gushurst that Petitioner had touched his penis and that Petitioner "would move it and grab it."  (Tr. 657).  S.N. stated that this occurred on multiple occasions.  (Tr. 657-58).  S.N. reported that Petitioner "made" him "grab" his penis and "suck on it."  (Tr. 658).  S.N. could not recall how many times this occurred.  (Tr. 658-59).  S.N. reported that on one occasion Petitioner attempted to penetrate his anus with his penis.  (Tr. 659).  Further examination revealed that Petitioner did not actually penetrate S.N.'s anus, however.  (Tr. 659).  Dr. Gushurst did not discover any evidence of trauma to S.N.'s anus or genitals, a circumstance which she did not consider unusual under the circumstances.  (Tr. 662-63).

**Z.N.**

Z.N. was born in March 1997 and is S.N.'s brother.  (Trial Transcript, August 26, 2010, 674-78).  When Z.N.'s family moved to the Kalamazoo area, Z.N., S.N., and Petitioner initially stayed in a hotel room together.  (Tr. 678-80).  Z.N. is a "heavy sleeper" and has to use two separate alarm clocks, sounding simultaneously, to awake in the morning.  (Tr. 679-80).  Z.N. was unaware of any activity taking place in the hotel room that night.  (Tr. 679-80).

After moving into their house, Z.N. had his own bedroom.  (Tr. 680).  This "scared" Z.N. because he was "the only one on the first floor."  (Tr. 680).  Eventually Z.N. began sleeping with S.N. in S.N.'s room.  (Tr. 681).  When this occurred, Petitioner would sometimes sleep with the boys.  (Tr. 681).  As Z.N. described it, "like we'd wake up and he'd [Petitioner] be in there." (Tr. 681).

Petitioner spent time with all the family's children, but he "spent a lot of time with [S.N.]."  (Tr. 682).  Petitioner would also take all the children out to eat, but when doing so Petitioner would purchase "something special" for S.N. that none of the other children received.  (Tr. 682-83).  Petitioner told Z.N. and his sisters that he "loved" S.N. and that "he was the only one that loved him."  (Tr. 684-85).  Z.N. texted with Petitioner "quite a bit" mostly concerning "what's up and I love you back and forth."  (Tr. 684-85).

Petitioner and S.N. "held hands" when they "were watching movies and stuff."  (Tr. 685-86).  The pair would also sit under a blanket during which time Z.N. "could see their heads moving and stuff."  (Tr. 686-87).  Z.N. never witnessed Petitioner and S.N. touching each other inappropriately.  (Tr. 697-98).  Petitioner also never attempted to touch Z.N.'s "private area."  (Tr. 697).  On one occasion, Z.N. was "looking through" Petitioner's phone and saw photographs of S.N. "tied up with some kind of tape or rope. . .in a chair"  (Tr. 687-88).  Petitioner's phone also contained photographs of S.N. "crawling around like a dog."  (Tr. 689, 695-96).

**K.N.**

K.N. was born in July 1994 and is sister to Z.N. and S.N.  (Trial Transcript, August 26, 2010, 700-01).  When the Norman family moved to the Kalamazoo area they initially stayed in

a hotel.  (Tr. 700-01).  The morning after S.N. slept in a hotel room with Petitioner, S.N. "was very sad and didn't want to be around [Petitioner] at all."  (Tr. 701-02).  S.N. "was trying to stay far away from [Petitioner]" and "was like very sad and crying and stuff."  (Tr. 702).  K.N. was "concerned" because she had not observed S.N. acting like this before.  (Tr. 702).  S.N. stated that he was sad "because [Petitioner] couldn't live with us."  (Tr. 703).

Petitioner and S.N. were "together a lot, all the time."  (Tr. 703).  The pair would "go behind the building" at Gerald Norman's scrap yard.  (Tr. 703-04).  K.N. also described an incident where Petitioner "brought [S.N.] up over his head and [S.N.'s] pants fell down" because "they must have been loose."  (Tr. 704-05).  Petitioner treated S.N. differently than the other kids.  (Tr. 705).  For example, if K.N. missed the school bus Petitioner "would throw a fit if he had to drive" her to school.  (Tr. 705).  When S.N. missed the bus, however, Petitioner "would just drive him and buy [him] breakfast."  (Tr. 705).  Petitioner would also "take [S.N.] to the gas station and buy him stuff."  (Tr. 705).  When K.N. asked Petitioner why he did not do these things for her, Petitioner refused to answer.  (Tr. 705-06).  Petitioner and S.N. often retreated to a bedroom and attempted to keep anybody else from entering.  (Tr. 706-07).

Petitioner also told S.N. "how he was the only one that loved [him] and that nobody else loved him or cared for him."  (Tr. 708).  K.N. heard Petitioner say this to S.N. "several times." (Tr. 708-09).  K.N. also witnessed Petitioner and S.N. sleeping "side by side" "together on the couch."  (Tr. 709-10).  At one point, Petitioner moved out of the Norman's home.  (Tr. 711).  After moving out, Petitioner would drive to the Norman residence and S.N. would sit with Petitioner in his truck for "a long time."  (Tr. 711-12).

K.N. also overhead a telephone conversation between Petitioner and Z.N. in which

13

they "repeated over and over about how they love each other and how they will always be best friends and stuff like that." (Tr. 710-11). K.N. never witnessed Petitioner and S.N. "sexually touch" each other. (Tr. 715). She also never witnessed Petitioner and Z.N. "touch" each other. (Tr. 715-16).

**Thomas Norman**

Thomas Norman is Gerald Norman's brother. (Trial Transcript, August 26, 2010, 721). Thomas Norman worked at his brother's scrap yard for several years during which time he encountered, and later worked with, Petitioner. (Tr. 721-24). Petitioner was usually in the company of young children, "mainly" boys, aged "fourteen and under." (Tr. 723-24). One of the children that accompanied Petitioner was named Stevie. (Tr. 724). Petitioner and Stevie "were always really close and they would sit next to each other in the truck." (Tr. 724). On other occasions, Stevie "would be laying down in the truck with his head towards the driver seat." (Tr. 724). When Petitioner "wasn't working and doing stuff," he spent "99 percent of the time" with S.N. (Tr. 725). Petitioner "would buy [S.N.] pop and candy and he treated him really good." (Tr. 725). Petitioner would "occasionally" buy the other kids pop and candy, "but not as much as he did [for S.N.]." (Tr. 725). Petitioner and S.N. were "just always really close to each other" and "would go off and be other places and we would have to look for them." (Tr. 725). Petitioner "would send I love you's through the Internet on My Space to [S.N.]." (Tr. 726).

Norman and his ex-wife had previously engaged in physical altercations and Gerald and Amy Norman "didn't want that around their kids." (Tr. 733-34). As a result, Gerald and Amy Norman did not allow Thomas Norman to be alone with their kids. (Tr. 733-34). Thomas Norman

14

indicated that he has his own children now and has "straightened up."  (Tr. 734-35).  Norman

asserted that he did not use vulgar or sexually explicit language in the presence of his brother's

children or any other children.  (Tr. 741).  Norman did not recall his brother ever doing so either.

(Tr. 741).  In 2002 or 2003, Norman's ex-wife accused Norman of inappropriately touching their

son.  (Tr. 744-45).  She accused Norman of "touching [his] son on the rear while he was in the

shower."  (Tr. 745).  When detectives realized that "there was no shower" in the residence in

question, Norman's ex-wife "took back her statement."  (Tr. 745).


**Thomas Bawkey**

Bawkey is Amy Norman's first cousin.  (Trial Transcript, August 26, 2010, 750).

Bawkey began working for Gerald Norman in June 2007.  (Tr. 751).  Petitioner was also working

for Gerald Norman at that time.  (Tr. 751).  Gerald Norman's kids were "usually" "around"

Petitioner, but "mostly" S.N.  (Tr. 751).  With respect to whether Bawkey ever witnessed any

inappropriate behavior involving Petitioner and S.N., the following exchange occurred:

> Q:    Did you ever see any behavior between the two of
>        them that you thought wasn't appropriate?
>
> A:    One time while working I walked into the garage, the
>        work place, and I saw the boy and [Petitioner] jump
>        up, guiltily - they had a guilty [look] on their face.
>        And normally if I had seen him sitting on his lap, it
>        wouldn't have raised a flag; but this particular day it
>        did and maybe it was the look the boy gave me or the
>        look that [Petitioner] gave me.  But something made
>        me feel very uneasy about it and I went and told what
>        I saw.
>
> Q:    You told who?
>
> A:    I believe Jerry or Tom.  I am not exactly sure - I am

> not exactly sure which one I told first.  But I did tell
> them that it made me uncomfortable.

Q:    When you say the boy, who are you referring to?

A:    [S.N.]

Q:    So, he would have been sitting on [Petitioner's] lap
where?

A:    Behind a computer table.  There is a computer sitting
on a desk when you walk in the room.  It was hidden
from my view, but I could see they both stood up real
quick and they walked in separate directions and - it
just seemed very odd to me.

Q:    You said something about the look on their face.
What kind of look did [they] have?

A:    For a brief moment, the boy had either almost a panic
look or a - a look of surprise or help, maybe.
[Petitioner] had a look of guilt, like I got caught.  And
I told Tom and Jerry that.  He looked like he got
caught.

(Tr. 752-53).

Bawkey also described an incident in which Petitioner "smashed" Bawkey's radio

after Bawkey called Petitioner a "faggot."  (Tr. 755-56).  Bawkey "had called [Petitioner] that before

and it had never got a rise out of him.  But this particular day it did."  (Tr. 756).


**Connie Black-Pond**

Black-Pond is a licensed professional counselor and licensed social worker.  (Trial

Transcript, August 26, 2010, 773).  She was then employed as the clinical director of the Southwest

Michigan Children's Trauma Assessment Center at Western Michigan University. (Tr. 773).  Black-

Pond specialized in "assessing and treating children that ha[ve] been sexually abused."  (Tr. 773).

Black-Pond did not examine S.N., but was permitted to testify as an expert in the assessment and

treatment of children who have been sexually assaulted and/or traumatized."  (Tr. 778-81).

   According to Black-Pond, "children who are sexually abused demonstrate a range

of emotional and behavioral characteristics and reactions to the maltreatment."  (Tr. 782).  Some

children "internalize their distress and their confusion" whereas others "externalize their distress and

their confusion and they may act out sexually, behaviorally."  (Tr. 782-83).  Because children "are

not at all prepared to deal with the sexual advances of an adult or the sexual demands of an adult.

. .one of the most common reactions that we see is that children are confused."  (Tr. 783).  As a

result of this confusion, children "don't immediately tell" what has happened to them.  (Tr. 783).

Children "also often experience a sense of shame" which "interferes in their ability to tell."  (Tr.

784).  If a child does report abuse, but experiences "a lack of support or disbelief by others, then

they may - may say, well never mind it didn't happen."  (Tr. 784).

   When asked whether some victims of sexual abuse "recognize what it is," Black-

Pond responded:

> Younger children in particular might not understand what is
> happening to them because they don't have a sense of what is
> appropriate and appropriate boundaries between adults and children.
> Older children often are engaged in the active sexual abuse by first
> participating in activities that are fun or activities that really feel
> good; that make them feel special; that make them feel they have a
> friend.  So, children are more often engaged by their offenders in
> activities prior to the abuse itself; that - I use the word engagement
> that really kind of pulls them in and makes them feel like they are
> being treated special.

(Tr. 788).

   Black-Pond indicated that children might then "become hypersexualized and seek

17

out sexual contact because they have been oriented to interactions in a sexual manner." (Tr. 788-89). She further suggested that their interactions with people may "become sexualized" because "they have been rewarded or that they have just learned that interactions with other people are positive when they are sexual." (Tr. 789). Black-Pond observed that victims of sexual abuse may experience difficulty relating specifics of the events. (Tr. 790-98). As a result, children "may refer to what happened to them the same way for each event." (Tr. 790).

**James Pence**

Pence is a private investigator employed by Petitioner's counsel to "conduct various interviews in this case." (Trial Transcript, August 31, 2010, 828-29). On March 6, 2010, Pence interviewed Tom Bawkey. (Tr. 829). Bawkey expressed to Pence the opinion that Tom and Gerald Norman were both generally dishonest. (Tr. 830). Bawkey described Gerald Norman as "shiesty." (Tr. 830-31). Bawkey told Pence that Tom and Gerald Norman would use vulgar, sexual language in the presence of Gerald Norman's children. (Tr. 832-33).

**Amanda Schester**

Schester had known Petitioner for 7-8 years. (Trial Transcript, August 31, 2010, 840). After graduating from high school in 2005, Schester moved in with Petitioner and her cousin, Tammie Fraly. (Tr. 840). Fraly had two children, Kayla and Stevie. (Tr. 841). Schester lived with Fraly and Petitioner for 18-24 months. (Tr. 841). During this time, Schester never observed Petitioner "do anything sexually inappropriate with either one of [Fraly's] children." (Tr. 842). According to Schester, Gerald Norman had a reputation in the community for being "pretty

18

dishonest." (Tr. 843).  After Petitioner was beaten by Gerald Norman, Amy Norman left voice mail messages for Petitioner informing him that she "missed him" and also sent him text messages stating that "we love you, we want you back."  (Tr. 845-46).

**Jessica Cebula**

Cebula had known Petitioner for "about 12 years."  (Trial Transcript, August 31, 2010, 856).  Petitioner lived with Cebula and her family for approximately 6 months in 2006-2007. (Tr. 856-57).  At the time, Cebula and her husband had four children ranging in age from 1 to 9.  (Tr. 857).  Petitioner helped Cebula's husband "work on the vehicles and stuff."  (Tr. 857).  Petitioner also helped with household chores.  (Tr. 857-58).  Cebula never witnessed Petitioner "do anything sexually inappropriate with any of [her] children."  (Tr. 858).  Cebula worked for Gerald Norman for about four months in 2006-2007.  (Tr. 858).  During this time, Cebula never witnessed Petitioner acting inappropriately with any of the Norman children.  (Tr. 858-59).  Gerald Norman frequently used vulgar and sexual language in the presence of his children.  (Tr. 859-60).  Cebula reported that Gerald Norman and Amy Norman both have reputations in the community for being "dishonest." (Tr. 863).

**Matthew Omar**

Omar had been friends with Petitioner for the previous 7-8 years.  (Trial Transcript, August 31, 2010, 876).  Omar owns a "towing and scrapping" business and used to "haul a lot of scrap" to Gerald Norman's scrap yard.  (Tr. 877).  Omar visited Norman's scrap yard at least 50 times.  (Tr. 878).  Gerald Norman regularly spoke in a vulgar and sexual manner around his children.

19

(Tr. 882-83).  Omar did not consider Gerald Norman to be honest or trustworthy.  (Tr. 883).  Omar likewise did not trust Tom Norman or Amy Norman.  (Tr. 883-84).  Eventually, there came a time when "Tom Norman just wasn't around" Gerald Norman's scrap yard.  (Tr. 884).  Omar later heard "rumors" that Tom Norman "molested the child that [Petitioner] is being accused of" assaulting. (Tr. 884-85).  Omar observed Petitioner in the presence of many children and never witnessed Petitioner acting in a sexually inappropriate way around any children.  (Tr. 885-86).

**Katherine Okla**

Okla earned a Ph.D. in clinical psychology and is licensed as a clinical psychologist. (Trial Transcript, August 31, 2010, 896-900).  After completing her education, Okla initially worked in a variety of settings conducting evaluations of children and potential offenders.  (Tr. 900-02). Okla entered into private practice in 1993 where she provides consulting and counseling services. (Tr. 902-03).  Okla did not examine S.N., but was permitted to testify as an expert on the topics of forensic interviewing of children and adolescents, as it relates to interviewing generally, but also as it relates to human memory.  (Tr. 895-923).

Okla indicated that "the general consensus" is that children do delay reporting abuse "if they are not asked."  (Tr. 929).  She indicated that if you ask a child "to give what is called a free narrative or a spontaneous unquestioned, undirected statement; a large majority of the time they will tell."  (Tr. 929-30).  She further noted that "the cases where we have good confidence that abuse happened is when kids will give the full disclosure when they are asked right up front."  (Tr. 930). On the other hand, "in those cases where they add bits and pieces over time, those are the cases where there is less certainty about abuse and/or more interviews with suggestive techniques."  (Tr.

930).

With respect to the ability of an individual to later recall previous events, traumatic or otherwise, Okla stated that "your memory is not a recording," but is "something subject to social pressures, time, new information, loss of details." (Tr. 934). Okla further stated:

> the world around you helps you interpret and remember things. You may have an event happen to you as a child that later on becomes interpreted differently. The event didn't change, but the meaning attached to it is different. . .And that is why, for example, a young child might not know that a sexual touch was sexual. But they also might think, a nonsexual touch like putting on diaper rash ointment or washing was done for sexual purposes. . .The same actual touch might be interpreted in one place by one person as a sexual bad touch or not, depending on what people react to and what they ask and what they tell you and what TV shows you watch and what education you get at the therapist's office.

(Tr. 935-36).

To enable interviewers and professionals to obtain better and more accurate information, questioning protocols began to be developed. (Tr. 937-39). In Michigan there exists the Michigan Governor's Task Force Forensic Interview Protocol. (Tr. 939-40). This protocol is "meant to protect against getting misinformation." (Tr. 940). One aspect of the Michigan protocol is that the interviewer must be unbiased and treat all possible explanations for a child's statements as "equally possible." (Tr. 944-45). Another aspect of the protocol is that the interview must take place in a "neutral setting" that is "child friendly." (Tr. 945). Also, the presence of anybody other than the child and the interviewer is "discouraged." (Tr. 946-47). The interviewer should ask "open-ended, neutral questions." (Tr. 948).

Dr. Okla reviewed the interview that Detective Chad Hurrle conducted with S.N. and noted several shortcomings vis-a-vis the Michigan protocol. (Tr. 951). First, she noted that Hurrle

was dressed in his police uniform which counteracts the desire for neutrality and absence of pressure during the interview.  (Tr. 954).  Rather than encouraging a "free, uninterrupted narrative" from S.N., the detective asked leading questions many of which assumed certain facts.  (Tr. 962-78).  Okla questioned the wisdom of allowing Amy and Gerald Norman to both be present during the interview.  (Tr. 954).  Okla noted that S.N. was placed in a corner of the interview room.  (Tr. 956).  Moreover, when S.N. became tired, Gerald Norman told him that "the sooner you tell, the sooner we can get out of here."  (Tr. 956).  Gerald and Amy Norman also "commented, asked questions, told information, challenged [S.N.], corrected him."  (Tr. 959, 978-80).  Okla interpreted much of the detective's comments and questions as "raising the thought in the child's mind that there is danger, potentially, here if he doesn't do the right thing."  (Tr. 957-60).

Okla concluded that this interview was not conducted in a manner consistent with the Michigan protocol.  (Tr. 981).  When asked to describe the significance of this conclusion, Okla stated, "anytime you have that degree of directed leading, suggestive questioning, introducing information, social pressures on multiple times by more than one person; you can't have any faith or confidence that what came out of this interview is fact based first-hand experience."  (Tr. 981-82).  Okla questioned whether the information obtained during the interview "came from this child or if it came from the parents."  (Tr. 982).  With respect to a subsequent interview, conducted in a manner more consistent with the Michigan protocol, Okla indicated that such was "irrelevant" because "at this point, any accurate memory, untainted by repeated questions and bad questions and social pressures and rewards and implied punishment or reward, is impossible."  (Tr. 983-84).

**Kayla Howes**

Petitioner lived with Kayla Howes and her family "for a couple of years." (Trial Transcript, August 31, 2010, 1045-46). Howes' mother was an alcoholic and Petitioner "was there to play the parent role, pretty much." (Tr. 1046). Petitioner helped with household chores and transported Kayla and her brother, Steven Howes, "everywhere [they] needed to go." (Tr. 1046-47). Howes never observed Petitioner acting inappropriately with any child. (Tr. 1047).

In July 2008, Petitioner was considering moving with the Norman family to the Kalamazoo area. (Tr. 1048). Howes "begged [Petitioner] not to go" because "he was a father figure to us." (Tr. 1049). Petitioner later contacted Howes, informing her that he was "hurt really bad." (Tr. 1049). Howes and two others drove to the Kalamazoo area to meet Petitioner. (Tr. 1050). Thereafter, Howes obtained possession of Petitioner's phone. (Tr. 1051). Howes listened to voicemail messages left by a female named Amy who told Petitioner that she "she loved and missed" Petitioner, that she was "sorry for anything that they ever did," and she just wanted Petitioner "to come home." (Tr. 1051-54). Howes reported that Gerald Howes' reputation in the community is that "he is known not to tell the truth." (Tr. 1048).

**Tammie Fraly-Saunders**

Petitioner began living with Fraly-Saunders and her family in 2002. (Trial Transcript, August 31, 2010, 1060-61). Fraly-Saunders has two children, Kayla Fraly-Howes and Steven Howes. (Tr. 1061). Petitioner lived with Fraly-Saunders for several years "on and off." (Tr. 1062). Petitioner's role in the family was "a big brother, another child to me." (Tr. 1062). Petitioner helped care for the entire family and was a father figure to the children. (Tr. 1062-63).

23

Fraly-Saunders never witnessed Petitioner acting inappropriately with any children. (Tr. 1064). Petitioner later returned to northern Michigan after living with the Normans. (Tr. 1064). Sometime thereafter, Fraly-Saunders listened to several voicemail messages in which Amy Norman expressed to Petitioner that she loved him and missed him. (Tr. 1064-66).

**Steven Howes**

Petitioner lived with Howes and his family for a period of time during which Petitioner provided Howes with "clothes or food" and transported him "where [he] needed to go." (Trial Transcript, August 31, 2010, 1072-73). Howes indicated that Petitioner "was there for me more than my parents were." (Tr. 1073). Howes suffers from Bruton's Agammaglobulinemia, a condition in which a person is born without white blood cells. (Tr. 1073). This condition has left Howes with "no immune system whatsoever." (Tr. 1073). A side effect of this condition is that Howes sleeps "more than a normal person would." (Tr. 1073). Howes accompanied Petitioner on scrap metal trips and would often fall asleep in the truck. (Tr. 1073-74). Gerald Norman talked "dirty" in the presence of his children. (Tr. 1075). Howes never witnessed Petitioner acting inappropriately with any of the Norman children. (Tr. 1075). Howes insisted that Petitioner never did anything sexually inappropriate to him. (Tr. 1075).

**Karen Roy**

Roy testified on rebuttal for the prosecution. (Trial Transcript, August 31, 2010, 1084-87). As of October 2007, Roy was employed as a Michigan State Trooper. (Tr. 1084). In October 2007, Roy contacted Gerald Norman regarding an investigation of stolen scrap material.

24

(Tr. 1084-85).  Norman was "very cooperative" and provided Roy with information which enabled the police to solve "at least seven crimes."  (Tr. 1085-87).  Roy also observed that Norman maintained "good records."  (Tr. 1087).

### Richard Mattison

Mattison was questioned again on rebuttal by the prosecution.  (Trial Transcript, August 31, 2010, 1092).  Jessica Cebula stated to Detective Mattison that everybody contacted by Mattison in this matter were "all very close friends."  (Tr. 1092).  Mattison also stated that Amanda Schester informed him that she "didn't know anything bad about the Normans."  (Tr. 1092).

### Gerald Norman

Norman was recalled to testify by the prosecution as a rebuttal witness.  (Trial Transcript, August 31, 2010, 1093-1108).  Just before Norman allowed Petitioner to move in with his family, Matthew Omar told Norman that he was "foolish to trust [Petitioner] around [his] kids." (Tr. 1093).

### Sarah Killips

Killips earned a Master's Degree in social work specializing in the area of "child maltreatment."  (Trial Transcript, September 1, 2010, 1119-21).  Killips subsequently worked as a crisis counselor and forensic interviewer at an advocacy center.  (Tr. 1116-19).  The "vast majority" of Killips' work concerns children who have suffered sexual abuse.  (Tr. 1120-21).  In this capacity, Killips has conducted "over 500" forensic interviews "over 80 percent" of which involved children

who had been sexually abused.  (Tr. 1124-25).  When conducting forensic interviews, Killips

follows the Governor's Task Force Forensic Interviewing Protocol.  (Tr. 1125).  Killips did not

examine S.N., but was permitted to testify as an expert in the areas of forensic interviewing and the

characteristics of children who allege sexual abuse.  (Tr. 1129-30).

Killips conceded that the interview of S.N. conducted by Detective Hurrle was

troublesome in certain respects and inconsistent in other respects vis-a-vis the relevant protocol.  (Tr.

1139-63, 1169-73).  With respect to the notion that the protocol recommends interviewing a child

in a neutral setting, Killips indicated that the room in which S.N. was interviewed "looked more like

someone's office than an interrogation room."  (Tr. 1139-40).  Regarding the fact that Detective

Hurrle was in his police uniform when he interviewed S.N., Killips stated:

> There is a recommendation that if possible, law enforcement not be
> in their uniforms.  The reason that that is the recommendation is
> because the cops are not seen as the good guys by all kids.  And kids
> might have had some very - maybe covert messages from their
> parents that law enforcement can't be trusted, but they may have
> been very explicit.  You can't trust police.  So, they may not feel
> comfortable with police officers in uniform.  That is not true of all
> kids.  Some kids might feel more comfortable with law enforcement
> being in uniform.  But because you can't tell who is going to be who,
> the recommendation is that law enforcement, when possible, not be
> in their uniforms.  Some law enforcement, it can't be avoided.

(Tr. 1140).

With respect to the presence of S.N.'s parents during the interview, Killips observed

that "it is not something that is recommended by the protocol. . .but the protocol does not say that

it is not allowed; it says that you can."  (Tr. 1142).  Killips noted that while one concern of having

a parent present during an interview is the possibility that "parents are suggesting answers to kids,"

there also exists the possibility that a parent's presence "can also work to shut kids down."  (Tr.

1143-44).  Killips acknowledged that the conduct of S.N.'s parents in the interview "could have" tainted the interview, but that there was "no way to know."  (Tr. 1150-56, 1188-90).  As for Detective Hurrle's conduct, Killips acknowledged that Hurrle often asked "poor" or "not very sophisticated" questions, but asserted that such did not "damage" the interview or "throw everything off."  (Tr. 1144-50).  Killips conceded that "it is possible" that Detective Hurrle's conduct "tainted" the interview, but "there is no way for anybody to know that."  (Tr. 1187-89).  Killips concluded by observing that while Detective Hurrle utilized "poor techniques" in conducting the interview, S.N.'s statements regarding the "main events" remained consistent.  (Tr. 1163, 1200).

Following the presentation of evidence, the jury found Petitioner guilty of all five counts.  (Trial Transcript, September 2, 2010, 1283).  Petitioner was sentenced to serve 25-40 years in prison on the first degree criminal sexual conduct convictions and lesser sentences for the other convictions.  (Sentence Transcript, October 4, 2010, 14-16).  Petitioner appealed his conviction to the Michigan Court of Appeals asserting the following claims:

I. As a matter of law the convictions should be reversed where the original forensic interview was so tainted and contrary to the requirements of the Michigan Forensic Interview Protocol statute that the convictions must be reversed as a matter of law.

II. The convictions must be reversed where there was insufficient evidence to convict.

III. The case should be remanded for resentencing on Counts 1 and 5 where these sentences violate the Michigan prohibition against cruel or unusual punishment and the federal constitutional prohibition against cruel and unusual punishment.

IV. The Sentencing Court improperly scored Offense Variable 11 on Counts 1 and 5 at 50 rather then 25 points where Defendant-Appellant was convicted of

27

all penetrations alleged and/or the trial court improperly "guessed" which penetrations to score under the guideline.

V. Defendant-Appellant's convictions should be reversed and he should be allowed to pled pursuant to the plea offer tendered before trial where Defendant-Appellant was not competent to evaluate and accept the tendered plea offer.

The Michigan Court of Appeals affirmed Petitioner's conviction and sentence. *People v. Fink*, 2012 WL 11003 (Mich. Ct. App., Jan. 3, 2012). Asserting the same five issues, Petitioner unsuccessfully moved in the Michigan Supreme Court for leave to appeal. *People v. Fink*, Case No. 144708, Order (Mich., June 25, 2012). Petitioner initiated the present action on June 24, 2013, asserting the following claims:

I. The convictions must be reversed where there was insufficient evidence to convict.

II. The law enforcement interview violated so many of the Michigan Forensic Interview Protocols that any statements made by the complainant at trial were so tainted that the convictions in this matter violated Petitioner's right to a fair trial and due process of law.

III. This case should be remanded for resentencing on Counts 1 and 5 where these sentences violate the federal constitutional prohibition against cruel and unusual punishment.

IV. Petitioner's convictions should be reversed and he should be allowed to plead pursuant to the plea offer tendered before trial where Petitioner was not competent to evaluate and accept the tendered plea offer.

## STANDARD OF REVIEW

Fink's petition is subject to the provisions of the Antiterrorism and Effective Death

28

Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254.  The AEDPA amended the substantive

standards for granting habeas relief under the following provisions:

> (d)     An application for a writ of habeas corpus on behalf of a
> person in custody pursuant to the judgment of a State court
> shall not be granted with respect to any claim that was
> adjudicated on the merits in State court proceedings unless
> the adjudication of the claim —
>
> > (1)     resulted in a decision that was contrary to, or involved
> > an unreasonable application of, clearly established
> > Federal law, as determined by the Supreme Court of
> > the United States, or
> >
> > (2)     resulted in a decision that was based on an
> > unreasonable determination of the facts in light of the
> > evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to

"prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the

extent possible under law."  *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law

when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a

question of law" or "if the state court confronts facts that are materially indistinguishable from a

relevant Supreme Court precedent and arrives at an opposite result."  *Ayers v. Hudson*, 623 F.3d 301,

307 (6th Cir. 2010) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause

of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect

that it would not be debatable among reasonable jurists."  *Gordon v. Kelly*, 2000 WL 145144 at *4

(6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999).  The

*Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court. *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at 411. Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable. *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12. Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case" or if it "either unreasonably extends or unreasonably refuses to extend a legal principle from the Supreme Court precedent to a new context." *Ayers*, 623 F.3d at 307. Furthermore, review under § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the "factual determination by [the] state courts are presumed correct absent clear and convincing evidence to the contrary." *Ayers*, 623 F.3d at 308. Accordingly, a decision "adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." While this standard is "demanding" it is "not insatiable." *Id.*

For a writ to issue pursuant to § 2254(d)(1), the Court must find a violation of clearly established federal law "as set forth by the Supreme Court at the time the state court rendered its decision." *Stewart v. Irwin*, 503 F.3d 488, 493 (6th Cir. 2007). This definition of "clearly established federal law" includes "only the holdings of the Supreme Court, rather than its dicta." *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). Nevertheless, "the decisions of lower federal courts may be instructive in assessing the reasonableness of a state court's resolution of an issue." *Stewart*, 503 F.3d at 493.

As previously noted, § 2254(d) provides that habeas relief "shall not be granted with respect to any claim that was adjudicated on the merits" unless the petitioner can satisfy the requirements of either § 2254(d)(1) or § 2254(d)(2). This provision, however, "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" *Harrington v. Richter*, 131 S.Ct. 770, 785 (2011). Instead, when a federal claim has been presented to a state court and the state court has denied relief, "it may be presumed that the state court adjudicated the claim on the merits." *Id.* at 784-85. Where such is the case, the Court must apply the deferential standard of review articulated above, rather than some other less deferential standard.

The presumption that the state court "adjudicated [a] claim on the merits" may be overcome only "when there is reason to think some other explanation for the state court's decision is more likely." *Id.* If this presumption is overcome, however, the Court reviews the matter de novo. *See Wiggins v. Smith*, 539 U.S. 510, 533-35 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *see also, Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not

31

addressed by the state courts).

**ANALYSIS**

**I.**          **Sufficiency of the Evidence**

Petitioner argues that he is entitled to relief because his convictions for first degree criminal sexual conduct, second degree criminal sexual conduct, and attempted first degree criminal sexual conduct are not supported by constitutionally sufficient evidence.

Claims challenging the sufficiency of the evidence are governed by the standard articulated in *Jackson v. Virginia*, 443 U.S. 307 (1979), pursuant to which it must be determined whether viewing the evidence in the light most favorable to the prosecution and according the benefit of all reasonable inferences to the prosecution, any rational trier of fact could have found Petitioner guilty beyond a reasonable doubt.  *See O'Hara v. Brigano*, 499 F.3d 492, 499 (6th Cir. 2007) (citing *Jackson*, 443 U.S. at 319-26).

When determining whether there exists sufficient evidence to support a conviction the Court may not weigh the evidence, assess the credibility of the witnesses, or substitute its judgment for that of the jury.  *See United States v. Paige*, 470 F.3d 603, 608 (6th Cir. 2006). Furthermore, where the record supports conflicting inferences the Court "must presume - even if it does not affirmatively appear in the record - that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."  *O'Hara*, 499 F.3d at 499 (quoting *Jackson*, 443 U.S. at 326).

During the time period relevant in this matter, an individual was guilty of first degree criminal sexual conduct if he engaged in sexual penetration with someone under 13 years of age.

*See People v. Kitchen*, 2007 WL 750380 at *1 (Mich. Ct. App., Mar. 13, 2007) (citing Mich. Comp. Laws § 750.520b). An individual was guilty of second degree criminal sexual conduct if he engaged in sexual contact with someone under 13 years of age. *See People v. Harding*, 2006 WL 120372 at *1 (Mich. Ct. App., Jan. 17, 2006) (citing Mich. Comp. Laws § 750.520b).

Sufficient evidence was presented at trial from which a reasonable juror could conclude that Petitioner committed first degree criminal sexual conduct, second degree criminal sexual conduct, and attempted first degree criminal sexual conduct. S.N. testified that Petitioner touched his penis and forced him to touch Petitioner's penis. S.N. testified that Petitioner performed oral sex on him and forced him to perform oral sex on Petitioner. S.N. testified that this happened "lots of times." Dr. Gushurst testified that S.N. related to her that Petitioner attempted to penetrate S.N.'s anus with his penis. There was also a significant amount of testimony that Petitioner targeted S.N. for particularly favorable treatment.

Petitioner's argument regarding the sufficiency of the evidence is nothing more than a request that this Court re-weigh the evidence and substitute its judgment for that of the jury something which the Court cannot do. As the Michigan Court of Appeals concluded:

> Defendant does not claim that the victim's testimony regarding the sexual conduct was insufficient to establish any of the elements of the crimes. Rather, he argues that, for numerous reasons, the victim's testimony should not have been believed. The reasons include that the first forensic interview tainted the victim's testimony, that the victim on two occasions when asked by his father denied that defendant had touched him, and that the victim's testimony contradicted statements he made in the forensic interviews. Defendant also contends that the testimony of the victim's family members should not be believed. However, our review of the sufficiency of the evidence is deferential. We must draw all reasonable inferences and make all credibility choices in favor of the jury verdict. We will not interfere with the jury's role of determining the credibility of the witnesses. The jury, having convicted defendant

of the five CSC charges, necessarily determined that the victim was credible.  We may not interfere with the jury's credibility determination.  Accordingly, the evidence, when viewed in the light most favorable to the prosecution, is sufficient to support defendant's convictions.

*Fink*, 2012 WL 11003 at *2 (internal citations omitted).

In light of the above authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

**II.**          **Due Process**

As noted above, S.N. was initially interviewed in this matter by Detective Chad Hurrle.  As also noted above, Katherine Okla and Sarah Killips both testified that the manner in which Hurrle conducted this interview was in certain respects inconsistent with the relevant forensic interviewing protocol.  Petitioner asserts that the interview conducted by Detective Hurrle "violated so many of the Michigan Forensic Interview Protocols that any statements made by the complainant at trial were so tainted that the convictions in this matter violated Petitioner's right to a fair trial and due process of law."  It is important to note that Detective Hurrle did not testify at trial and there is no indication that the prosecution otherwise introduced into evidence the results of Detective Hurrle's interview with S.N.  Thus, Petitioner's claim is not that the results or contents of the interview were improperly admitted, but rather that because the interview was allegedly so deficient, permitting S.N. to testify at trial violated his right to a fair trial.  Petitioner makes this argument

34

despite failing to move at trial to suppress S.N.'s testimony.

Petitioner first asserts that because Detective Hurrle's interview allegedly violated Michigan law, he is entitled to relief.  To the extent Petitioner argues that the interview in question violated some provision of Michigan law, such is not a basis for obtaining habeas relief.  *See* 28 U.S.C. § 2254(a) (the federal courts can only consider habeas claims alleging violations of the Constitution, laws, or treaties of the United States).  Moreover, the Michigan Court of Appeals rejected Petitioner's claim that he is entitled to relief based upon the alleged failure by Detective Hurrle to comply with the Michigan Forensic Interview Protocol.  *Fink*, 2012 WL 11003 at *1-2.

As for Petitioner's due process argument, the Court first notes that Petitioner failed to present this argument in his state court appeals.  Thus, this particular argument has not been properly exhausted.  Petitioner, who has been represented by counsel throughout, has likewise declined to request a stay of this matter so that he may return to state court and litigate this issue.  Petitioner's failure to exhaust notwithstanding, the Court may deny this claim on the merits.  *See* 28 U.S.C. § 2254(b)(2) ("[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State").

In support of his argument, Petitioner asserts that "[h]istory is replete with examples of false accusations made by children."  Petitioner states that "[y]oung children are particularly susceptible to suggestion" and "[m]emories are often confused, making it difficult to delineate authentic memories from false ones."  Petitioner further states that there "is a 'consensus in the social-science literature' that children may offer testimony that is so substantially shaped by the suggestions of adults as to be unreliable."  Petitioner then asserts that Detective Hurrle's interview

of S.N. was so unreliable that permitting S.N. to testify violated his right to a fair trial.  Petitioner's argument, however, overlooks one very salient point, namely that Petitioner declined to seek the suppression of S.N.'s testimony.  Instead, Petitioner, not unreasonably, sought to challenge S.N.'s credibility through cross-examination and the expert testimony of Katherine Okla.

Petitioner has failed to identify any controlling authority which stands for the proposition that the admission of testimony from an alleged crime victim, who was subject to thorough cross-examination, violates a defendant's right to a fair trial based upon an argument, never asserted at trial, that a pre-trial investigative interview, which was not presented to the jury, was allegedly conducted in a deficient manner.  Simply put, Petitioner made a strategic choice to not challenge S.N.'s ability to testify, but to instead challenge S.N.'s credibility through cross-examination and the expert testimony of Katherine Okla.  That this strategy was unsuccessful does not render Petitioner's trial unfair.  *See, e.g., Clemmons v. Sowders*, 34 F.3d 352, 358 (6th Cir. 1994) ("[f]undamental fairness does not require a perfect trial").

Petitioner's attempt to analogize the present circumstance to instances of impermissibly suggestive identification procedures is equally unpersuasive.  An identification procedure employed by the police "may at times pose due process concerns - but it does so 'only when law enforcement officers use an identification procedure that is both suggestive and unnecessary.'"  *Williams v. Bauman*, 759 F.3d 630, 638 (6th Cir. 2014) (quoting *Perry v. New Hampshire*, - - - U.S. - - -, 132 S.Ct. 716, 724 (2012)).  Accordingly, due process is violated where the police utilize procedures that are "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."  *United States v. Watson*, 540 Fed. Appx. 512, 514-15 (6th Cir., Oct. 4, 2013) (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)).

The purpose of prohibiting such impermissibly suggestive identification procedures, however, "is not to ensure the reliability of identification evidence, but to deter malfeasance by investigating officers." *Watson*, 540 Fed. Appx. 515 (citing *Perry*, 132 S.Ct. at 726). In the absence of such malfeasance, the matter becomes a credibility question for the jury to resolve:

> The Constitution, our decisions indicate, protects a defendant against a conviction based on evidence of questionable reliability, not by prohibiting introduction of the evidence of the evidence, but by affording the defendant means to persuade the jury that the evidence should be discounted as unworthy of credit. Constitutional safeguards available to defendants to counter the State's evidence include the Sixth Amendment right to counsel, and confrontation plus cross-examination of witnesses. Apart from these guarantees, we have recognized, state and federal statutes and rules ordinarily govern the admissibility of evidence, and juries are assigned the task of determining the reliability of the evidence presented at trial. Only when evidence 'is so extremely unfair that its admission violates fundamental conceptions of justice,' have we imposed a constraint ties to the Due Process Clause.

*Perry*, 132 S.Ct. at 723 (internal citations omitted).

Petitioner has failed to demonstrate that the interview in question was so "extremely unfair" that permitting S.N. to testify violated his due process right to a fair trial. Petitioner, assisted by counsel, was afforded the right to confront and cross-examine S.N. as well as introduce other evidence concerning S.N.'s credibility. The jury was simply unpersuaded by Petitioner's evidence and arguments. Accordingly, this claim is rejected.

III.            **Sentencing Claim**

As noted above, Petitioner was convicted of two counts of first degree criminal sexual conduct, two counts of second degree criminal sexual conduct, and one count of attempted first degree criminal sexual conduct.  Petitioner was sentenced to serve the following concurrent prison sentences: (a) 25-40 years on the first degree criminal sexual conduct convictions; (b) 10-15 years on the second degree criminal sexual conduct convictions; and (c) 40-60 months on the attempted first degree criminal sexual conduct convictions.  Petitioner now asserts that his sentence violates his Eighth Amendment right to be free from cruel and unusual punishment.

Petitioner complains that his sentence is not proportional to the crimes of which he was convicted.  The Eighth Amendment, however, "does not require strict proportionality between crime and sentence." *United States v. Layne*, 324 F.3d 464, 473 (6th Cir. 2003) (quoting *Harmelin*, 501 U.S. at 1001).  Instead, the Eighth Amendment simply forbids extreme sentences that are "grossly disproportionate" to the crime committed.  *Layne*, 324 F.3d at 473.  When a court assesses whether a sentence imposed by a state court satisfies the Eighth Amendment's "limited guarantee of proportionality," it must "grant substantial deference to the. . .legislatures. . .in determining the types and limits of punishments for crimes."  *Id.* at 473-74.  Accordingly, "a sentence within the maximum set by statute generally does not constitute cruel and unusual punishment."  *Id.* at 474.

Petitioner's sentences were not greater than the maximum sentences allowed for his various convictions.  *See* Mich. Comp. Laws §§ 750.92, 750.520b, 750.520c.  Moreover, Petitioner's sentences are in no way "grossly disproportionate" to the crimes of which he was convicted.  The Michigan Court of Appeals rejected this claim.  *Fink*, 2012 WL 11003 at *3.  In light of the above authority and facts, the Court concludes that this decision is neither contrary to, nor involves an

38

unreasonable application of, clearly established federal law.  Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

## IV.          Petitioner's Rejection of Plea Bargain

One the first day of trial, prior to the jury selection process, Petitioner's attorney placed on the record certain details regarding the plea negotiations between the parties.  Petitioner's attorney noted that Petitioner had been offered a plea deal pursuant to which he would plead guilty to second degree criminal sexual conduct and serve three years in prison.  (Trial Transcript, August 24, 2010, 15).  Petitioner then stated on the record that his attorney had explained to him "on several occasions" the details of the plea offer.  (Tr. 16).  Petitioner stated that he had been afforded a "full and complete opportunity" to discuss the matter with his attorney as well as with his parents.  (Tr. 16).  Petitioner further stated that after considering the matter he made the decision to reject the plea offer and proceed to trial.  (Tr. 16-17).  Petitioner now argues that due to "a debilitating mental health disorder caused by the sexual abuse he suffered as a child," he was "not competent to evaluate and accept the tendered plea offer" and is, therefore, entitled to habeas relief.

It is well accepted that "the criminal trial of an incompetent defendant violates due process." *Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996).  To be competent to stand trial, a criminal defendant must possess: (1) a "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and (2) "a rational as well as factual understanding of the proceedings against him." *United States v. Dubrule*, - - - F.3d - - -, 2016 WL 2610255 at *6 (6th Cir., May 6, 2016) (Quoting *Dusky v. United States*, 362 U.S. 402, 402 (1960)).  This standard

39

likewise applies in the context of plea negotiations. *See United States v. Manley*, 618 Fed. Appx. 276, 279 (6th Cir., July 13, 2015) (citing *Godinez v. Moran*, 509 U.S. 389, 396 (1993)). Under Michigan law, a criminal defendant is presumed to be competent. *See* Mich. Comp. Laws § 330.2020(1). The Supreme Court has held that state statutes presuming the competence of criminal defendants do not violate the Constitution. *See Medina v. California*, 505 U.S. 437, 449 (1992).

The Michigan Court of Appeals rejected Petitioner's claim that he lacked sufficient competence to reject the plea offer:

> The record contains no evidence to rebut the presumption that defendant was competent. In fact, defense counsel created a record that established that defendant understood the terms of the plea offer and that, after consulting his parents and counsel, defendant chose to reject the offer and proceed to trial. In addition, no evidence indicates that defendant suffered sexual abuse as a child. Indeed, pursuant to the presentence report, defendant denied 'any physical, emotional, or sexual abuse of any kind' while growing up. At the sentencing hearing, defense counsel stated that he 'spen[t] a great deal of time going over each of the paragraphs [of the presentence report] with [defendant] and read to him what each of the paragraphs contain[ed].' Defense counsel stated there were no additions, corrections, or deletions that needed to be made. Because there is no evidence to support defendant's claim, we reject the claim that defendant was incompetent to evaluate and accept the tendered plea offer.

*Fink*, 2012 WL 11003 at *4 (internal citations omitted).

Petitioner still has presented no evidence to support his claims of childhood abuse or alleged incompetence. In light of the above authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

## CONCLUSION

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States. Accordingly, the undersigned recommends that Fink's petition for writ of habeas corpus be **denied**. The undersigned further recommends that a certificate of appealability be denied. *See Slack v. McDaniel*, 529 U.S. 473 (2000).

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within 14 days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,


Date:  June 10, 2016                                            /s/ Ellen S. Carmody
                                                                     ELLEN S. CARMODY
                                                                     United States Magistrate Judge